Sesser Community Unit District No. 196, Franklin County, Illinois, Gene Allsup, et al., Plaintiffs-Appellees, v. The County Board of School Trustees of Franklin County, Illinois, H. L. Browning, Secretary, County Board of School Trustees of Franklin County, Illinois, Herbert Mundell and Frank Hayse, and Community Consolidated School District No. 47, Franklin County, Illinois, and Consolidated High School No. 103, Franklin County, Illinois, Defendants-Appellees, and Dallas Rea, et al., A Committee of Ten Designated by the Petitioners to Represent Them in the Matter of a Petition to Detach Territory From Sesser Community Unit District No. 196, Franklin County, Illinois, and The Annexation of Said Territory to Community Consolidated School District No. 47 and to Consolidated High School District No. 103, Both in Franklin County, Illinois, and Dallas Rea, et al., Defendants-Appellants.

Gen. No. 65–72.

Fifth District.

August 2, 1966.

Hill and Hill, of Benton (Joseph W. Hickman, of counsel), for appellants.

Hodson & Pennock, of Centralia, for appellees.

EBERSPACHER, J.

This is an appeal from a judgment of the Circuit Court of Franklin County which reversed the administrative decision of the County Board of School Trustees of Franklin County granting defendants-appellants petitioners' request to detach certain territory from plain-

tiff-appellee Sesser Community Unit District No. 196, and annexing the territory to Community Consolidated District No. 47, Franklin County, Illinois, for elementary school purposes and Consolidated High School District No. 103, Franklin County, Illinois. These three districts will herein be referred to respectively as Sesser Unit, Benton Grade and Benton High Districts.

Previous to July 25, 1963, there had been in existence in Franklin County the Valier Community High School District No. 97, which overlaid the Valier Grade School District and parts of a number of other grade school districts including part of the Benton Grade District. On that date all the territory of the Valier Community High School District No. 97 (with all underlying elementary school territory) was legally attached to the Sesser Unit. Despite this annexation two high school students who resided in what was previously the Valier High School District, continued to attend the Benton High School during the 1963–1964 school year as high school students had traditionally done in previous years, and six grade school students who have previously resided in the Benton Grade District, continued to attend Benton Grade School during the 1963–1964 school year. The record shows that for the past 10 years, with few exceptions, they had gone to Benton schools. The record does not disclose, and no claim is made that tuition was ever paid for any students attending Benton High or Benton Grade, who resided outside these respective districts, or whether there was any agreement between the respective districts involved as to attendance of pupils residing in the Sesser Unit territory attending either grade or high school outside the Sesser Unit District. There is also evidence in this record that previous to the time of the annexation of the territory to Sesser there was some understanding with reference to the territory of Benton Grade being allowed to be annexed to Sesser Unit and then detached without objection; that the

interested boards of education had conferred about this, and that after the annexation to Sesser, appeals were taken, the cost of which was contributed to by people for whose benefit the agreement had been made, and resulted in the Sesser Unit District expending some $3,000 in defending the annexation, and as a result the Sesser Unit felt they no longer had an obligation to honor the "gentlemen's agreement." This evidence was presented as a result of interrogation by a member of the County Board of School Trustees, and examination, following the trustee's inquiry, by the Sesser Unit's counsel, both without objection.

On June 3, 1964, a petition, pursuant to § 7-6 of the School Code, was filed to detach from the Sesser Unit, and annex to Benton High and Benton Grade Districts slightly more than 1,000 acres, practically all of which had been in the Benton Grade District and in the Valier Community High School District, previous to the annexation of the Sesser Unit, of an assessed valuation of approximately $57,750. This petition, when originally acted on by the County Board of School Trustees, apparently failed inasmuch as four board members were present (a quorum), three of them voted to allow the petition and one voted against allowing the petition. Since the statute required a majority of all of the board (seven) to permit "action," the petition was ruled by the chairman to have failed. Subsequently, in accordance with the statute, the petitioners, through their committee of ten, filed a motion for a rehearing which rehearing was taken under advisement and, at length, granted. Acting on the record, the Board then granted the prayer of the petition permitting the detachment and annexation.

The plaintiff school district, from whom the detachment was permitted, commenced a proceeding under the Administrative Review Act. This resulted in a judgment of the circuit court, finding that the order of the defendant, County Board of School Trustees, was erroneous

as "not supported by the evidence in the case and is contrary to the manifest weight of the evidence," and further finding that the County Board did not "give proper consideration to the requirements of § 7–6 of the School Code of Illinois," in that the evidence showed that "the division of funds and assets resulting from the granting of the petition would jeopardize the educational resources of plaintiff (Sesser) school district and be detrimental to the educational welfare of the pupils of such school district without any corresponding benefit to the educational welfare of the pupils of the defendant school districts, or to the pupils of the entire area." From this order this appeal has been perfected.

 The Administrative Review Act of Illinois, par 11 (Ill Rev Stats c 110, par 274), states:

> "The findings and conclusion of the Administrative Agency on questions of fact shall be held to be prima facie true and correct."

However, the court has power to review all questions of law and fact presented by the record on administrative review of an order of the administrative agency, and to reverse such order, where the School Trustees failed to comply with the standards required by the legislature, (Crainville School Dist. v. County Board, 32 Ill App2d 143, 177 NE2d 248), and where the order is not supported by the evidence, or is contrary to the manifest weight of the evidence. (Board of Education of Community Unit School Dist. No. 323 v. County Board, 19 Ill App2d 196, 153 NE2d 378, 381.)

Further examining the record we find that both the Sesser and Benton systems enjoy approval by the North Central Association and the Superintendent of Public Instruction; that both provide bus transportation which goes through the affected area, or immediately adjacent thereto; transportation to the attendance centers, to which the various students would be assigned, can be

provided with no additional expense by the 3 involved districts. The evidence shows the distances and highway conditions to be sufficiently comparable, considering modern transportation practices and methods as being of no consequence. Enrollment of the students from the territory would require no additional facilities or additional teachers.

The Benton High School has in excess of 800 students, while the Sesser High School has in excess of 250. The Junior High School in the Benton Districts has an enrollment of approximately 300 (grades 7 and 8), while the Junior High School in the Sesser District has an enrollment of 130. Both the High School and Junior High School in the Benton systems are of sufficient size to permit departmental operation and provide a potential of more diversification and more varied curricula. On the elementary level the Sesser Unit has in addition to the usual elementary program, music, art, and Spanish; in the Benton District in addition to the usual elementary program there is a guidance program, speech correction, remedial reading, vocal music, band, athletics, and a strong health program, with a language program in French. Benton has available school oriented activities such as Parent-Teachers Association, Brownie and Cub Scouts and a health program in cooperation with the Bi-County Health Board. The Junior High School at Benton has its own athletic program, health program, Glee Club, and Student Council. The High School at Benton is of sufficient size to operate a department of guidance, approved by the State Department, involving three members of its staff.

That the opportunity for a well-rounded education for children at all levels is superior in the Benton Districts is well supported by this record.

It is important to note that while the petition is in the form of a request for detachment from the Sesser

Unit, the action of the School Trustees in granting the petition maintains the status quo, with reference to attendance; children in the territory would continue as they have for as long as this record shows, to attend Benton schools. While there was evidence of personal desire and convenience, there was ample evidence that it was the desire of petitioners that the children in the territory continue to have a better opportunity for a better education; the parents preferred the challenge and competition coming from a larger school system, with the increased opportunity for scholastic and extra curricular competition. In one case they wished to continue with the speech correctionist who had been aiding their son. It is evident that were the petition denied, the students involved who had started in French in grade school, would have to begin Spanish, if they desired a foreign language course, and could only return to their study of French when they reached high school in the Sesser Unit. It is conceded that personal desires and conveniences of the petitioners also influenced the preference of petitioners, but such evidence was coupled with an element of educational opportunity, and a desire for these children to continue their identification with school districts in their natural community center.

That part of the School Code which provides that the School Trustees "shall determine whether it is to the best interest of the schools of the area and the educational welfare of the pupils that such change in boundaries be granted," (c 122, § 7–6), despite the fact that such language is coupled with financial considerations, certainly does not take away from the great weight of evidence of educational opportunity and continuity in education. Work experiences and inspiration obtained outside the classroom may be as valuable as the classroom experiences, and where students may conveniently ride with their parents to attend and participate in school

159

functions, after the bus has taken others home, or while the parents are attending to matters in their community center, are educational experiences that should not be summarily denied the children involved.

We are not unmindful of the admonitions of Oakdale Community Consol. Unit School Dist. No. 1 v. County Board, 12 Ill2d 190, 145 NE2d 736, that boundaries are not to be changed by the shopping, banking, or school preferences, and that personal preferences do not control. Nor do we disregard the rule of Trico Community Unit School Dist. No. 176 v. County Board of School Trustees, 8 Ill App2d 494, 131 NE2d 829, which rule was approved by our Supreme Court in the Oakdale case, that

> "Although the residents of territories within the district may initiate a petition for detachment because of personal desires or convenience, much more is needed to support the board's decision to change established boundaries. The welfare of the affected districts and the pupils as a whole must control, rather than the wishes of a few, and such petitions granted only where the benefit derived by the annexing or affected areas clearly outweighs the detriment resulting to the losing district and the surrounding community as a whole."

From this record we are of the opinion that the language found in Burnridge v. School Trustees of Kane County, 25 Ill App2d 503, 167 NE2d 21, is particularly applicable. At pages 509 and 510, 25 Ill App2d (167 NE 2d, p 24), the court said:

> "But even as much or more than these considerations, is the fact that an identification with a school district in a child's natural community center will inevitably result in increased participation in school activities by the child and his parents. Such increased participation cannot but result in an im-

160

provement in the educational picture of the entire area. By the same token, an unnatural identification with a school district would have an opposite result with a corresponding loss of participation and resulting poorer educational picture. In recognition of these facts the legislature made provision for proceedings to change the boundaries of existing districts."

Section 7-6 of the School Code also provides in part:

"Prior to the hearing the secretary shall submit to the county board of school trustees maps showing the districts involved, a written report of financial and educational conditions of districts involved and the probable effect of the proposed changes . . . . The county board of school trustees shall hear evidence as to the school needs and conditions of the territory in the area within and adjacent thereto and as to the ability of the districts affected to meet the standards of recognition as prescribed by the Superintendent of Public Instruction, and shall take into consideration the division of funds and assets which will result from the change of boundaries . . . ."

 Examination of the record shows that the necessary maps were presented. The secretary, in compliance with the statute, presented a written report of the financial and educational conditions of the districts involved. It showed the financial condition and status of each of the districts as of June 30, 1963, taken from the latest reports filed by the respective districts in his office, including assessed valuations, comparative tax rates, bonded indebtedness, bond limits, assessed valuation of each of the districts of the petition was granted, comparative enrollments, number of teachers, and average daily attendance, and the number of school children

161

residing in the territory. While this petition was presented almost a year later than the 1963 report, the 1963 report was the last official report available to the secretary, and we hold it to meet the requirements of the statute. He is not required to keep a daily account of the financial condition of the schools, and unless evidence, other than opinion evidence of a change of condition is presented to him, it would be unreasonable to expect his report to reflect any other than official figures. No objection was made to the adequacy of the report in the hearing. The Sesser Unit has contended that its financial condition deteriorated due to the Valier annexation which is not shown by the report. The record discloses that the Sesser Unit had made some expenditures which it had not anticipated at the time it annexed Valier, and presented evidence that there would be other expenditures which they had not anticipated at the time of that annexation. It was shown however that such expenditures were made necessary because previous to and at the time of the Valier annexation they had misapprehended the indebtedness of the Valier District and the physical condition of its properties, and that its assessed valuation would not produce as much revenue as they had contemplated. At the time of the hearing, they had received no taxes from this territory, and of course had not received any State aid, since none of the pupils involved had ever been in attendance in the Sesser Unit.

The record shows that the Benton Districts are not levying the maximum without referendum, and the bonded indebtedness of the Benton Districts is much greater than that of the Sesser District. The Sesser rate is the maximum permitted without referendum, but no component of its school tax rate of 2.72 is at the maximum, although both the educational and building tax rate are at the maximum, without referendum; no referendum has been attempted. Applying the Sesser rate to the assessed valuation of the territory involved, it would

produce approximately $1,500 in tax revenue. State aid to the system which the 8 children would attend would at existing rates amount to approximately $500 to $1,000 per year, depending on attendance. The total of this revenue amounts to approximately 1% of the Sesser Unit's State aid and local taxes as shown by its June 1963 report. Normally there is more variation than 1% in the receipts from year to year, according to varying collection rates and the number of pupils in average daily attendance. It is a misnomer to say that the Sesser Unit will lose this sum, because since the students are attending Benton Schools, they are not getting the State aid for these students; Sesser has likewise never had the tax revenue. In terms of materials and educational welfare, it would appear that the materials which the revenue would provide, would be of equal value to the Benton Districts, and since the Benton tax rates, on a combined basis, are slightly below the Sesser rate, and the indebtedness of the Benton Districts so appreciably greater, the need per student in the Benton Districts would be more acute.

■ The merits of these modest proportions of school income, cannot as a matter of law, be considered as determinative. In Board of Education, McLeansboro Tp. High School v. County Board of School Trustees, 45 Ill App2d 292, 196 NE2d 3 at p 4, the court said:

". . . no single fact is controlling in connection with the decision of the Board (Kinney v. County Board of School Trustees, 7 Ill App2d 286, 129 NE2d 292). The cases indicate that it was not the intention of the Legislature to freeze boundaries of school districts in order to prevent an increase in tax rate, and that where detachment is determined, there must necessarily be some financial loss to the school district (not all of the property owned by the persons seeking detachment was included in the detachment

163

petition). Loss of revenue cannot be the basis for denying detachment (Community Unit School District, etc. v. County Board, 9 Ill App2d 116, 132 NE2d 584.)"

See also School Dist. No. 106 v. County Board of School Trustees of Cook County, 48 Ill App2d 158, 198 NE2d 164, and cases cited herein.

■ The Sesser District's contention that any persistent erosion has taken place by reason of the fact that it has been required to defend four petitions by which it was put to legal expense is misstatement of erosion. Legal expense is no defense to a petition for detachment.

As they point out, the Sesser District, within a one-year period of this petition, had annexed to it the entire Valier District territory plus portions of several other districts. Since this annexation, 160 acres were detached in one petition. The Sesser District was well aware that this petition was contemplated and had apparently indicated its prior intention to assent to this detachment. The territory involved in this case was less than ten percent of the over 12,000 acres recently annexed to the Sesser District. They indicate that the defendant somehow, although they had no authority in law to do so, should have amended the petition annexing the 12,000 acres to Sesser to withdraw their territory. They fail to point out how it was possible for these present defendants, who were not then petitioners to annex to Sesser, could have amended this petition by their own action. The malady of which Sesser now claims to suffer is accretion rather than erosion, and these problems were voluntarily assumed, without interference from these petitioners who obviously relied on commitments of the Sesser Unit to assent to their annexation to the Benton Districts.

■ The plaintiffs make some point that the Compulsory School Attendance Law provides that the person having custody of a child "shall cause such child to attend some public school in the district wherein the child resides."

They evidently overlooked People v. Levison, 404 Ill 574, 14 ALR2d 1364, where the court said:

> "The object is that all children shall be educated not that they shall be educated in any particular manner or place."

The construction placed on this statute by the plaintiffs ignores the statute permitting districts to pay tuition to other districts for the education of the district's children (Ill Rev Stats 1963, c 122, § 10–22 and § 12–20) and the statute which provides authority to school districts "to admit nonresident pupils when it can be done without prejudice to the rights of resident pupils and to provide them with any services of the school including transportation" (Ill Rev Stats 1963, c 122, § 10–22.5).

■ Here the evidence of the two Sesser employees that the Sesser Unit would be financially jeopardized by allowing this annexation to the Benton Districts does not foreclose the manifest weight of the evidence, since their opinions are without substantial foundation in the evidence. Where the educational welfare of students is involved, we are not bound to accept such opinions and are not accordingly bound to deny an order to the contrary as being against the manifest weight of the evidence, without regard to the facts on which such opinions purport to be based.

■ We have also examined the contention that the order violates the rule with reference to compactness and contiguity. The granting of this petition does no

violence to any rules concerning compactness and contiguity.

 The Board of School Trustees in the present hearing were familiar with the local problems, they were in the best possible position to understand local conditions and school needs; likewise, they were advised by their own records of their attempts to better the educational welfare of the children of the county; they were adequately advised of the financial effect of this action as well as their previous actions. We cannot say that they did not take all these things into consideration, and where there has been substantial compliance with the statute, their determination should be affirmed. The judgment of the Franklin County Circuit Court is therefore reversed, and the order of the Franklin County Board of School Trustees is affirmed.

Judgment reversed.

GOLDENHERSH and MORAN, JJ., concur.